PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BUZULENCIA, Trustee of the Bankruptcy Estate of James R. Grope III, | ) ) ) | CASE NO.  4:11CV2293 |
| Plaintiff, | ) ) | |
| | ) | JUDGE BENITA Y. PEARSON |
| v. | ) ) | |
| THE OHIO BELL TELEPHONE COMPANY, | ) ) ) | **MEMORANDUM OF OPINION AND ORDER** |
| Defendant. | ) ) | [Resolving ECF No. 53] |

Pending is Defendant Ohio Bell Telephone Company's Motion for Summary Judgment (ECF No. 53).  The Court has been advised, having reviewed the record, the parties' briefs, and the applicable law.  For the reasons set forth below, the Court denies the motion.

## I.  Facts

James R. Grope III began working for Defendant telephone company in 1995.  ECF No. 1-1 at ¶ 2.  He worked in a line construction position for almost four years; and repair for ten years before transferring to the position of customer service specialization or "field technician," the position he held when he was terminated in September 2009.  As a technician, Grope traveled to locations in the greater Youngstown, Ohio area to respond to service calls for installation and repair of AT&T products for new and existing customers.  *Id.* at ¶ 2; ECF No. 53-2 at PageID #: 585, Page 80.  Grope would go on these assignments alone.  ECF No. 53-2 at PageID #: 592,

(4:11CV2293)

Page 109.  His car, which was a company-owned vehicle, was outfitted with an electronic

("Global Positioning System" or "GPS") tracker to monitor usage and for safety purposes.  ECF

No. 53-3 at PageID #: 933, Page 63-64.  GPS records were not to be used as a disciplinary tool.

*Id*; ECF No. 53-5 at PageID #: 991, Page 18-19.  Grope's employment was governed by a

collective bargaining agreement between the company and Grope's union, The Communications

Workers of America.  ECF No. 53-2 at Page ID #: 585, Page 80-81.

As a technician, Grope was supervised by a first-line supervisor.  *Id.* at PageID #: 596,

Page 124.  First-line supervisors report to area managers, who then report to the Director of

Network Services.  *Id.*  While working as a technician, Grope reported to several first-line

supervisors.  *Id.* at PageID #: 568, Page 12.  He reported to Justin Wooden until September 2008;

Kevin Rance from September 2008 until January 2009; Wooden again from January 2009 until

May 2009; and, finally, Dawn Schulz from May 2009 until the time Grope was terminated.  *Id.* at

PageID #: 596-97, Page 124-26.  Carl Cramer was Grope's area manager from 2003 until August

2009, at which point, Adam Menough served as area manger.  *Id,* Page 127-28.; ECF No. 53-8 at

PageID #: 1053.  Menough was the area manager when Grope was terminated.  ECF No. 53-2 at

PageID #: 597, Page 127.  Dominick Mamone was the Director of Network Services for

Northern Ohio and Outstate Michigan at the time of Grope's termination.  ECF No. 53-5 at

PageID #: 988, Page 6.

Grope was diagnosed as suffering from migraines, for which he received medical

treatment.  ECF No. 53-2 at Page ID #: 664, Page 396.  During his employment with Ohio Bell,

Grope missed work on various dates during 2008 and 2009 due to migraines.  ECF No. 1-1 at ¶

(4:11CV2293)

13.  For those absences, Grope took leave under the Family and Medical Leave Act (FMLA).  *Id.* In regards to Adam Menough, the supervisor who made the decision to terminate Grope, Grope claims that Menough knew or should have known that he suffered from migraines and had taken FMLA leave in the past and that Grope himself  may have told Menough at some point.  ECF No. 53-2 at PageID #: 667, Page 406-07.  On December 20, 2013, Menough filed a declaration with the Court that he neither had knowledge of Grope's prior use of FMLA leave, nor that Grope suffered from migraine headaches.  ECF No. 53-7 at ¶ 10.

Technicians, like all company employees, are expected to follow relevant workplace rules and procedures. *See* ECF No. 53-2, Ex. 1, 3.  The two main sources of workplace rules and procedures for technicians are the Network Services Technician Expectations policy ("Tech Expectations") and the company's Code of Business Conduct ("COBC").  *Id.*

Under Ohio Bell's employment structure, the first-line supervisor and area manager are both expected to monitor a technician's productivity.  *Id.* at Page ID #: 593, Page 110.  One method used to monitor and analyze technician performance and productivity is a "deep dive," an examination of a technician's work for the day.  ECF No. 53-5 at PageID #: 993, Page 29.  A deep dive can be ordered and performed by either a first level supervisor or an area manager.  *Id.* A deep dive is a common occurrence and can be triggered by a number of different events, but usually it is performed when there is low productivity by a technician, *i.e.*, when a technician performs a low number of jobs in a given day.  ECF No. 53-3 at PageID #: 934, Page 66.

During his time as a technician, Grope had been subject to various actions for failure to adequately perform his workplace duties and follow proper procedure.  *See*  ECF No. 53-2 at

3

(4:11CV2293)

Exs. 6-42.  Some of this came in the form of disciplinary action that included punishment.  *Id.*

In other instances, Grope received "coaching" where one of Grope's superiors would discuss

with him ways in which he was not meeting expectations and what he could do to correct these

shortcomings.  *Id.*

 Grope received a written warning and a one-day suspension for misconduct on July 10,

2007 for spending three hours conducting union business while he was supposed to be on a repair

job.  *Id.* at Ex. 6-7.  During this time, Grope left the company vehicle unlocked.  *Id.*  Inside the

car was company property, such as the laptop issued to Grope.  *Id.*  Both leaving the car unlocked

and the use-of-company time issue were violations of company rules.  *Id.*  Later that year, on

September 1, 2007, Grope again violated Tech Expectations by taking a sixty-eight (68) minute

break.  *Id.* at Ex. 8.  Under Tech Expectations, the technicians are afforded two fifteen-minute

breaks and a thirty-minute unpaid lunch break.  *Id.* at Ex. 3.  Breaks are not allowed to be taken

concurrently.  *Id.*  Carl Cramer, area manager at the time of the infraction, had the option to take

the next step in the company's disciplinary procedure due to Grope's prior infraction; however,

Cramer exercised leniency and, instead, provided documented coaching to Grope on work rules

regarding lunches and breaks.  ECF No. 53-8 at ¶ 3.

 On March 8, 2009, Grope violated the Tech Expectations once more in three different

ways.  ECF No. 53-2, at Ex. 13.  First, Grope left his vehicle idling through one of the extended

breaks that he took—if a vehicle is idling for more than one minute a technician is supposed to

turn off the vehicle in order to save gasoline.  *Id.*  Second, Grope took a thirty-six minute break

and a forty-two minute break—time violations, of the type for which he had previously received

4

(4:11CV2293)

coaching.  *Id*.  Third, Grope failed to leave collateral at the job site, which is a required practice

at every job site where a technician completes a job.  *Id*.  In addition to violations of Tech

Expectations, Grope also breached the COBC during the investigatory meeting regarding these

violations by rising during said meeting and yelling "Fuck you" to Justin Wooden, his supervisor.

*Id*.  For these violations, Grope received a five-day suspension and final warning.  *Id*.

      Grope violated Tech Expectations yet again on April 28, 2009.  *Id*. at Ex. 18.   Grope did

not leave the company garage until 9:29 a.m., which is more than an hour after a technician

whom starts at 8:00 a.m., which Grope did that day, is expected to have departed the company

garage to begin servicing their required jobs for the day.  *Id*. at PageID #: 610, Page 181; *See also*

*Id*. at Ex. 1.  At the first two locations Grope visited, he left his vehicle idling for forty and fifty-

two minutes, respectively.  *Id*. at PageID #: 611, Page 183-85.  After leaving the second location,

Grope took twenty minutes to complete a two-mile drive, a route which normally takes about five

minutes to drive.  *Id*. at Page ID #:612-13, Page 187-93.  Upon arriving at this location, Grope

took a one hour and twenty minute lunch break (twenty minutes longer than Grope was afforded

for a lunch break—on this particular day, Grope was allowed to take a one-hour lunch break).  *Id*.

at PageID #: 613-14, Page 193-96.  Later that day, at 2:56 p.m., Grope left the job site he was at

and returned to work, used the restroom, then returned to the same job site at 3:27 p.m.  *Id*. at

PageID #: 617, Page 207.  This action violated the fifteen-minute break rule.  *Id*., Page 208.

      Grope attempted to rationalize his actions at an investigatory hearing on the matter.  *Id*. at

PageID #: 619, Page 216-17.  In regard to his extended lunch, he claimed that he was actually

working at the central office; however, his supervisor, Justin Wooden, determined that his story

(4:11CV2293)

did not make sense based on what Grope asserted he was repairing. *Id.* at *Ex.* 18. As a result of the investigation on the matter, Grope was suspended pending termination. *Id.* at Ex. 14, 18. As a result, Grope filed a grievance. *Id.* at Ex. 20.

On May 27, 2009, Grope participated in a union-management review board hearing to address his suspension pending termination. ECF No. 53-6 at ¶ 4. At the hearing were Grope, two union representatives, Area Manager Carl Cramer, and Labor Relations Manager Bryan Redfern. *Id.* Cramer concluded that Grope violated the Tech Expectations policy in two ways. ECF No. 53-8 at ¶ 5. First, Grope misused company time. *Id.* Second, Grope allowed his vehicle to idle for too long. *Id.* Because Grope had previously received a final warning, Cramer could have terminated his employment. *Id.* Instead, Cramer allowed Grope to enter into a back to work agreement, which allowed Grope to return to work after a period of suspension. ECF No. 53-2 at Ex. 21. Under the terms of this agreement, Ohio Bell had the power to terminate Grope for any future violations of company rules. *Id.*

After returning to work, Grope was placed on an Individual Action Plan by his supervisor, Dawn Schultz, on September 10, 2009 for failure to meet performance expectations. *Id.* at Ex. 22. The plan required Grope to make various improvements, including: (1) increase his performance efficiency; (2) pre-call all of his customers to provide an estimated time of arrival; (3) leave the garage prepared to dispatch to his first location by 8:20 a.m. each day; and (4) contact Shultz or another manager if a project was taking longer than the two hours generally expected for completion. *Id.*

6

(4:11CV2293)

On September 23, 2009, Grope violated his back to work agreement.  *Id.* at PageID #: 632, Page 267-68.  Grope left the garage at 8:44 a.m. and he did not contact his supervisor to alert her to his tardy dispatch.  *Id.* at PageID #: 634, Page 274. Under the terms of his Individual Action Plan, Grope was required to alert his supervisor if he was going to be late leaving the garage.  *Id.* at Ex. 22.  Grope never completed his first job assignment for the day, as he was unable to make contact with the customer.  *Id.*  During this time, however, he left his vehicle idling for nine minutes, which is eight minutes longer than company policy permitted.  ECF No. 53-2 at Page ID #: 635, Page 279; *Id.* at Ex. 3.  At ten o'clock that morning, Grope visited an antique store that a friend owned and took a thirty-minute coffee break.  *Id.* at PageID #: 636-37. The length of this break is in violation of the Tech Expectation that limits breaks to fifteen minutes.  *Id.* at Ex. 3.  After the coffee break, Grope traveled to the North Jackson central office to perform work for his second assignment of the day.  *Id*. at PageID #: 636-37*, Page 285-86.* Grope arrived at the office at 10:38 a.m.; however, according to readings from his security card, he did not enter the building until 11:14 a.m. *Id*., Page 288.  Grope departed the central office at 11:58 a.m.  *Id, Page 289*.  At this point, Grope visited a few locations before going to lunch at 12:57 p.m.  *Id*. at PageID #: 638, Page 257.  Grope was allotted forty-five minutes for lunch and he took slightly over that amount of time for lunch.  *Id.* at PageID #: 638, Page 293.  Grope arrived at a location at 2:03 p.m. and parked his car for one hour and forty-three minutes, allowing it to idle for most of that time.  *Id.* at PageID #: 640, Page 298.  During this time, Grope was on the phone for approximately forty-five minutes.  *Id.*, Page 299.  At 3:53 p.m., Grope left the job site failing to complete the job.  *Id.* at PageID #: 642, Page 309.  Though

7

(4:11CV2293)

Grope had spent longer than two hours on the job, Grope failed to contact his supervisor as required by his Individual Action Plan.  *Id.* at PageID #: 640, Page 300.  It took Grope thirty minutes to return to the garage, which was double the amount of time it would generally take to commute from the job site to the garage where Grope ended his day.  *Id.* at PageID #: 643, Page 310-312.

Another investigatory hearing was held on September 28, 2009.  *Id.* at PageID #: 644, Page 317;  ECF No. 53-3 at 922-23, Page 20-21.  During the meeting, Menough found Grope to be uncooperative.  *Id.* at PageID #: 923, Page 22.  Menough claims that, for portions of the meeting, Grope sat in his chair with his arms crossed, staring at the ceiling.  *Id.*, Page 23.  Based on this meeting, as well as through information gathered during the investigatory process, Menough decided to terminate Grope's employment.  ECF No. 53-7 at ¶ 5.  Menough concluded that Grope violated his back to work agreement, as well as various Tech Expectations.  *Id.* Specifically, Menough concluded: (1) Grope left the garage late on September 23, 2009 without permission; (2) Grope failed to pre-call his first customer until four minutes before arriving at the customer's location; (3) Grope was parked at an antique store for thirty minutes before having completed any work that day; (4) Grope spent forty-five minutes at the central office testing pairs[1], a task which is expected to take approximately fifteen minutes; (5) Grope spent forty-five

---

[1] "Testing pairs refers to the process technicians use to test F1 cables for defects. F1 cables run from a central office to a cross box.  To test a pair, the technician uses a tool that plugs into the cable, and the tool tells the technician if the cable has a defect and, if so, the exact location of the defect."  No. 53-7 at ¶ 3.  According to Menough, "[t]he process of 'testing pairs' requires a minimal amount of time; testing a half-dozen pairs in

(continued...)

(4:11CV2293)

minutes on the phone with a customer dealing with an issue unrelated to the job he was currently

assigned; and (6) Grope did little, if any, work on his second assignment of the day, after labeling

his first ticket as unable to complete due to lack of access to the customer's premises. *Id*.

Grope's union grieved the termination with his union. ECF No. 53-2 at PageID #: 655,

Page 359. On November 3, 2009, a union-management grievance meeting was held. ECF No.

53-6 at ¶ 11. Ohio Bell upheld its initial decision to terminate Grope's employment. *Id.* at ¶ 14.

The Union then refused to arbitrate the decision, because Grope had signed a back to work

agreement and admitted to committing at least two infractions of company policy after signing

that agreement. ECF No. 53-2 at Ex. 35-42.

On September 22, 2011, James R. Grope III filed a Complaint (ECF No. 1-1) in the

Mahoning County, Ohio Court of Common Pleas, Case No. 2011 CV 03164, alleging three claims:

(1) an interference claim under the FMLA; (2) a retaliation claim under the FMLA; and (3) a

discriminatory and an unjust discharge claim under Ohio Rev. Code Ch. 4112. *Id.* Ohio Bell

removed the case to this Court on October 25, 2011, on the basis of federal question jurisdiction

conferred by 28 U.S.C. § 1331. *See* Defendant's Notice of Removal (ECF No. 1) at ¶¶ 3-4. On

December 30, 2009, Grope filed a voluntary petition for relief in a case under Title 11 of the United

States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District

of Ohio, being Case No. 09-44845-kw. The case at bar was subsequently stayed and administratively

closed. ECF No. 25. On May 1, 2013, a motion to reopen was granted, the case was reinstated to

---

[1](...continued)
most instances will not exceed 5 to 15 minutes." *Id.*

(4:11CV2293)

the Court's active docket, and Michael Buzulencia, Trustee of the Bankruptcy Estate of James R.

Grope, III, was substituted as a plaintiff in the place and stead of James R. Grope III.  ECF No. 35.

On December 20, 2013, Ohio Bell filed a Motion for Summary Judgment (ECF No. 53).

### II.  Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure

materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v.*

*Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or

other similar materials negating a claim on which its opponent bears the burden of proof, so long as

the movant relies upon the absence of the essential element in the pleadings, depositions, answers

to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The

moving party must "show that the non-moving party has failed to establish an essential element of

his case upon which he would bear the ultimate burden of proof at trial."  *Guarino v. Brookfield*

*Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving

party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely on

its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be

resolved by a jury."  *Cox v. Ky. Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  The

non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and

that the record, taken as a whole, does not lead to a judgment for the movant."  *Guarino*, 980 F.2d

at 403.  In reviewing a motion for summary judgment, the court must view the evidence in the light

(4:11CV2293)

most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily will not be sufficient to defeat a motion for summary judgment. *Id.*

### III. Discussion

### A. Characterization of Plaintiff's FMLA Claims

Plaintiff advances two different arguments under the FMLA. First, Plaintiff advances an interference claim, under 29 U.S.C. § 2615(a)(1), which states, "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.." In addition, Plaintiff advances a retaliation claim, under 29 U.S.C. § 2615(a)(2), which states "[i]t shall be unlawful for any employer to discharge or in any other

11

(4:11CV2293)

manner discriminate against any individual for opposing any practice made unlawful by this subchapter." A claimant can bring a claim under either an interference or retaliation theory without waiving the other claim. *See Wysong v. Dow Chemical Co.*, 503 F.3d 441, 446 (6th Cir. 2007).

While "a claim for retaliatory discharge is cognizable under either theory, the requisite proofs differ." *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F. 3d 274, 282 (6th Cir. 2012) (footnote omitted). The main operative difference between the two theories is an intent requirement. One element of plaintiff's prima facie case under a retaliation theory is that plaintiff must demonstrate that "a causal connection existed between the adverse employment action and the protected activity." *Gembus v. Metrohealth System*, 290 Fed. Appx. 842, 845 (6th Cir. 2008). An interference claim, on the other hand, has a more lenient standard, where the plaintiff does not have to prove intent. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507 (6th Cir. 2006). This is in contrast to the retaliation theory where "the employer's motive *is* an integral part of the analysis." *Id.* at 508 (emphasis in original). In cases of retaliation, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.* (emphasis omitted).

The interference theory of recovery "is derived from the FMLA's creation of substantive rights." *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). As such, in order to advance an interference claim, plaintiff must establish that "the employer denied the employee FMLA benefits to which she was entitled." *Durden v. Ohio Bell Telephone Co.*, No. 1:12 CV 734, 2013 WL 1352620, at *11 (N.D. Ohio April 2, 2013) (Gaughan, J.) (emphasis omitted). If a plaintiff does not make a showing that they have been denied FMLA benefits and instead have only shown

12

(4:11CV2293)

discharge, then the proper characterization of the claim is a retaliation claim rather than an interference claim.  *Id.*; *See also Stallings v. Hussman*, 447 F.3d 1041, 1050-51 (8th Cir. 2006) (concluding that a terminated employee's FMLA claim was properly characterized solely as a retaliation claim because the employee was never denied leave and was only terminated upon return from leave).  The Sixth Circuit has also endorsed this approach.  *See Seeger*, 681 F.3d at 282 (holding that "the essence of Seeger's claim is retaliation, not interference with his substantive FMLA rights").

While Plaintiff advances both claims in the Complaint (ECF No. 1-1), in reality, the two claims are properly characterized as a single retaliation claim.  Plaintiff has failed to demonstrate that the employer denied Grope leave under the FMLA.  In fact, Plaintiff noted in the Complaint various dates in 2008 and 2009, where Grope was granted leave due to his severe migraine headaches.  ECF No. 1-1 at ¶ 13.  There is nothing to indicate that Grope was denied time off from work due to his migraines.  Instead, the basis of the claim is that Grope was terminated because of his use of FMLA leave, which is alleging a retaliatory action.  As such, his claims under the FMLA can be characterized strictly as a retaliation claim.

**B.  Plaintiff's FMLA Retaliation Claim**

In a retaliation claim under the FMLA, an employer is not allowed to discriminate against employees for taking FMLA leave.  *Skranj v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).  Plaintiff must prove three elements to satisfy the prima facie case:  (1) Grope engaged in a protected activity; (2) Grope suffered an adverse employment action; and (3) a causal connection existed between the adverse employment action and the protected activity.  *Gembus*, 290 Fed. Appx.

13

(4:11CV2293)

at 845. If plaintiff satisfies this burden, the defendant must offer a legitimate, non-retaliatory reason for the adverse action. *Id.* In turn, if the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the posited reason was pretextual. *Id.*

Defendant argues that Plaintiff failed to satisfy the third element of a prima facie case, *i.e.*, causation. ECF No. 53-1 at 557. Defendant's main argument is that Menough, Grope's supervisor who made the decision to terminate his employment, had no knowledge of Grope's prior use of FMLA leave; and that alternatively, even if Menough did have knowledge, there is not enough evidence to establish a causal connection because there is a six-month gap between Grope's last use of FMLA leave and his termination. *Id.* at 544. Alternatively, Defendant argues that even if Plaintiff was able to establish a prima facie case, Defendant terminated Grope for a non-retaliatory reason and Plaintiff cannot establish that this reason was pretextual. *Id.* at 558. In regard to this argument, Defendant relies on the honest belief rule, which holds that "[a]s long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'" *Seeger*, 681 F.3d at 285-86 (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998)).

In regard to Plaintiff's prima facie case, Plaintiff satisfies the first two required elements. First, Grope availed himself of a protected right under the FMLA by taking FMLA leave on various dates in 2008 and 2009. Second, Grope's termination was an adverse employment decision. As to the third element, the causal connection requirement, there is conflicting evidence which creates a question of material fact.

(4:11CV2293)

In order to prove causation, a plaintiff "must produce sufficient evidence from which an inference can be drawn that he would not have been fired had he not engaged in the protected activity." *Simpson v. Vanderbilt University*, 359 Fed. Appx. 562, 571 (6th Cir. 2009). While "no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). In general, courts are fairly reluctant to find that a plaintiff has not met the prima facie case at the summary judgment stage of proceedings. *See EEOC v. Avery Denison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

The Court finds a factual dispute exists as to whether Menough had knowledge of Grope's disability. Grope claims that he may have told Menough or that Menough should have known of his disability. ECF No. 55 at 1144. Grope initially stated in his deposition, "I don't know that I conveyed that to him directly myself at any point," when asked if Menough knew that Grope suffered from migraines. ECF No. 53-2 at 667. Later in this line of questioning, Grope stated "[a]ctually I do believe he did hear that directly from me because I think back to the conversation him and I had, I probably described them and why I had missed work and why I felt that, you know, he was being told to look out for me and that sort of thing." *Id*. Moreover, Plaintiff claims that other individuals at Ohio Bell had knowledge of his use of FMLA leave. *Id*. at 569, 571-72, 577, 578, 625, 663.

Menough avers in a declaration that he did not have knowledge of Grope's disability at the time of the adverse decision. ECF No. 53-7 at ¶ 10. These competing statements are enough to create a question of material fact as to whether a causal connection exists between the adverse employment action and the protected activity. That Grope claims that he probably told Menough

15

(4:11CV2293)

about the disability is enough to establish that he did, if the fact is taken in a light most favorable to Plaintiff.  Whether Grope's testimony is true is an issue of credibility and issues of credibility are "jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255; *Adams v. Metiva*, 31 F.3d 375, 384 (6th Cir. 1994).

1.

Next, the Court finds Ohio Bell has satisfied its burden of offering a legitimate, non-retaliatory reason for the employment decision.  Menough declared that Grope violated the Tech Expectations, as well as his back to work agreement, and that for these reasons he decided to terminate Grope's employment.  ECF No. 53-7 at ¶ 5.  Plaintiff's argument against this is that Ohio Bell's proffered reason was pretextual.  ECF No. 55 at 1142-44.  The pretext analysis also raises questions of material fact.

There are three manners in which a plaintiff can advance a pretext argument.  *Seeger*, 681 F.3d at 285.  A plaintiff can show "that the employer's proffered reasons (1) have no basis in fact, (2) did not actually motivate the action, or (3) were insufficient to warrant the action." *Id.*  That said, when an employer relies on an honest belief in making its decision, the employee cannot establish pretext.  *Id.* at 285-86.  An honest belief is held by an employer when it can establish that it "reasonabl[y] reli[ed] on the particularized facts that were before it at the time the decision was made." *Smith*, 155 F.3d at 807.

While honest belief is an accepted defense, "[a]n employer's invocation of the honest belief rule does not automatically shield it, because the employee must be afforded the opportunity to

16

(4:11CV2293)

produce evidence to the contrary, such as an error on the part of the employer that is too obvious to

be intentional." *Seeger*, 682 F.3d at 286 (internal quotation omitted).  When making such a showing

"[a]n employee's bare assertion that the employer's proffered reason had no basis in fact is

insufficient to call an employer's honest belief into question, and fails to create a genuine issue of

material fact." *Joostberns v. United Parcels Services, Inc.*, 166 Fed. Appx. 783, 791 (6th Cir. 2006).

There is a factual dispute as to whether Defendant satisfies the requirements of the honest

belief rule.  In Menough's declaration, he was able to point to particularized facts that formed the

basis for his decision to terminate Grope's employment.  Menough noted five independent violations

of company policies on September 23, 2009.  To wit, they are:  (1) Grope failed to pre-call his first

customer until four minutes before arriving at the customer's location; (2) Grope was parked at an

antique store for thirty minutes before having completed any work that day; (3) Grope spent forty-

five minutes at the central office testing pairs, a task which is expected to take approximately fifteen

minutes; (4) Grope spent forty-five minutes on the phone with a customer dealing with an issue

unrelated to the job he was currently assigned; and (5) Grope did little, if any, work on his second

assignment of the day after labeling his first ticket as unable to be completed due to lack of access

to the customer's premises.  ECF No. 53-7 at ¶ 4.  These actions amounted to a violation of the back

to work agreement.

Underpinning these reasons for termination is Menough's declaration that he had no

knowledge that Grope used FMLA leave in the past nor did he have any knowledge that Grope

suffered from migraines.  *See* ECF No. 53-7 at ¶ 10.  Menough's knowledge of this is in dispute,

however, because of Grope's deposition testimony.  *See* ECF No. 53-2 at 667, Page 406-07.  If

17

(4:11CV2293)

Menough had knowledge of Grope's FMLA leave, it may be that Menough relied on that as a factor in his decision to terminate Grope.  For the same reasons as articulated above in the prima facie case analysis, there is a question of material fact as to whether Menough had knowledge that Grope had used FMLA leave in the past.

In addition, Plaintiff argues that there is sufficient evidence to raise a pretext argument.  ECF No. 55 at 1143-45.  First, Grope claims that eight different employees in the company, including Menough, told him that he was being targeted by individuals employed by Defendant for his use of FMLA leave.  ECF No. 53-2 at PageID #: 568 (Page 11-13), 571-72 (Page 23-26), 577 (Page 46-47), 578 (Page 53), 625 (Page 238-39), 663 (Page 290).  In fact, Grope even accused Menough of saying that his bosses had told him to "go after" Grope.  He testified:

> I had known Adam previously when he was a first line manager.  When he came back to Youngstown as a second level, him and I spoke.  He actually brought it to my attention, he says, What's this, you know, I'm being told to go after you, what's that all about?  I thought you were a good tech.  I've always liked you and your dad.  What's the problem?

*Id.* at 663, Page 390.

In order in order to survive a motion for summary judgment, the non-moving party cannot rely solely on "conjecture or conclusory accusations."  *Arendale v. City of Memphis*, 519 F.3d 587, 605 (6th Cir. 2008).  Additionally, "the Sixth Circuit and United States District Courts in Ohio have consistently held that isolated and ambiguous discriminatory remarks are insufficient to overcome a motion for summary judgment."  *Schlett v. Avco Financial Services, Inc.,* 950 F.Supp. 823, 828 (N.D. Ohio1996); *see also, Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1025-26 (6th Cir.), *cert denied*, 510 U.S. 861 (1993); *Gagne v. Northwestern Nat'l Ins. Co.*, 881 F.2d 309, 314 (6th Cir.

(4:11CV2293)

1989); *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 n. 2 (6th Cir. 1986), *cert denied*, 480 U.S. 919 (1987).

Even if the statements do not evince a discriminatory intent on the part of Menough, Defendant may still be liable, "[i]f the comments were made by a person in a position to influence the alleged employment decision . . . unless they are so isolated and ambiguous as to be nonprobative." *Hopkins v. Electronic Data Systems Corp.*, 196 F.3d 655, 665 (6th Cir. 1999); *see also Arendale*, 519 F.3d at 604 n. 13 ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a rubber stamp or cat's paw theory of liability.") (internal quotations omitted). An employer may be liable under the cat's paw theory of liability when the decisionmaker "acted as the conduit of the supervisor's prejudice." *Romans v. Dept. of Human Servs.*, 668 F.3d 826, 836 (6th Cir. 2012) (internal brackets omitted).

Here, Grope alleges that people whom were in a position to influence the decisionmaker made the statements. Dominick Mamone, who Grope alleges was one of the people attempting to retaliate against Grope for his use of FMLA leave, was Menough's boss. ECF No. 53-2 at PageID #: 573, Page 33. At Menough's deposition, the possibility was raised that Mamone ordered the deep dive, which revealed information that, in part, led to Grope's termination. ECF No. 53-3 at Page ID #: 934, Page 66. Whether Mamone actually was able to influence the discharge decision through his actions is in dispute. Accordingly, whether Mamone actually played a part in the termination determination is therefore a jury question.

19

(4:11CV2293)

Second, the company's use of GPS on Grope's vehicle as a disciplinary tool is also in dispute.  Because it is not clear that GPS should be used as a disciplinary tool, it is a question of material fact as to whether its use here was demonstrative of a discriminatory intent.  According to Mamone, GPS was not to be used as a disciplinary tool; rather, GPS tracking was to be used to monitor safety and performance.  ECF No. 53-5 at Page ID #: 991, Page 19.  Grope asserts that there was a clear understanding that GPS was not to be used as a disciplinary tool.  ECF No. 53-2 at Page ID #: 604, Page 154.  Menough, however, cites to GPS evidence to substantiate the reasoning for Grope's dismissal.  ECF No. 53-7 at ¶ 5.

Management had used GPS information in the past when levying a punishment against Grope for violation of Tech Expectations; however, that written warning was later removed.  ECF No. 53-2 at Ex. 10.  Grope's union grieved his initial punishment on the ground that company policy was that GPS was not to be used as a disciplinary tool.  Id.  The company subsequently agreed to remove the warning.  Id.

In addition, Plaintiff points out that GPS information was only used due to Grope's refusal to cooperate in the investigation against him.  ECF No. 55 at PageID #:1142.  Menough admitted in his deposition that, if Grope "cooperate[d] in the investigation, then the GPS should not have been used as a disciplinary tool."  ECF No. 53-3 at PageID #: 933, Page 64.

Third, Grope points to an e-mail sent in February 2004 by Todd Wichert, a former supervisor, which complained about Grope's absences from work.  ECF No. 53-2 at Ex. 31.  The email, which was sent to two other supervisors, expressed the view that Grope did not belong at the company and suggested that the three individuals should try to find a way to terminate his employment.  Id.  In the

20

(4:11CV2293)

email, Wichert stated "[t]his kid has taken up enough of my time, I have been 'Cutting the Cards', its time to take the next step. We can't do anything about FMLA or Workman's Comp (still waiting for the verdict on the latest disability) let's skip a step and help out our shareholders." *Id.* The overall timbre of this excerpt insinuates that Wichert had cut Grope a fair amount of slack over the years and that he was tired of doing so. While the statement that they could not punish Grope for using FMLA does not necessarily suggest discriminatory animus (as explained below), the suggestion to "skip a step" in the following sentence, however, appears to suggest that these individuals find some reason to support the termination of Grope's employment. When read in a light most favorable to Plaintiff, the email implies that Wichert was searching for a way to have Grope fired for his absences.

The probative value of this evidence is mitigated by the temporal gap between the e-mail, which was sent in 2004, and the adverse action, which occurred in 2009. *See Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2007)* (stating that "proximity in time between the protected activity and the adverse employment action may constitute evidence of a causal connection.") Temporal proximity as a method of proof for causation usually only extends back a few months. *See Clark v. Walgreen Co., 424 Fed. Appx. 467, 473 (6th Cir. 2011)* (concluding that termination in March of 2007 was evidence of a causal connection for retaliation against use of FMLA leave by an employee between December 2006 and January 2007). The gap in the case at bar is much longer than a few months. The e-mail was sent in 2004. Grope was not terminated until 2009. Because this e-mail was authored in 2004 by an individual who was not a party to the termination decision, this piece

(4:11CV2293)

of evidence offers a very minimal measure of probative value for discriminatory animus on the part of Defendant, if any at all.

Fourth, in April 2009, Justin Wooden, another former supervisor of Grope, wrote a statement questioning the validity of Grope's use of FMLA leave.  ECF No. 53-5 at Ex. E (note from 04/10/2009).  Wooden wrote "[s]upervisor suspects abuse of [FMLA] due to pattern [of] absences. EE has a chronic condition (migraines) but once his FMLA is exhausted he no longer calls out ill." *Id.*  Wooden noted that most of the days that Grope requested off using FMLA leave were Sundays, which awarded Grope premium pay since it was a Sunday.  *Id.*  A company is within its rights to investigate suspected instances of FMLA fraud.  *Hall v. Ohio Bell Telephone Co.*, No. 1:11CV1219, 2012 WL 3113157, at *11 (N.D. Ohio July 31, 2012) (Gaughan, J.).  There is nothing in the record to indicate that this was an permissible investigation into whether the use of FMLA leave by Grope was valid.  Therefore, this issue does not raise an issue of material fact.

The amalgamation of these four categories of evidence (the various statements that Grope was being targeted by individuals inside Ohio Bell, the Wichert e-mail, the Wooden written statement, and the use of GPS records as a disciplinary tool) does not evince notions of isolated action or pure conjecture.  Plaintiff can point to a pattern of discriminatory statements, as well as use of the GPS as a disciplinary tool to demonstrate a discriminatory animus on the part of Ohio Bell. The e-mail from Wichert and written statement from Wooden do not offer much probative value, as they are either too attenuated in time or appear to be permissible.  While this evidence does not appear to demonstrate a discriminatory animus to establish pretext, it is a question of material fact

22

(4:11CV2293)

as to whether the use of the GPS records and statements attributed to various supervisors indicate discriminatory animus.  It is therefore improper to grant summary judgment on the FMLA claim.

Admittedly, there are questions as to the strength of some of this evidence.  For instance, all of the testimony relating to employees of Ohio Bell allegedly telling Grope that certain high level employees in the company were out to get him was only communicated by Grope and not the actual speakers of the alleged statements, even though two of them (Menough and Cramer) were deposed in this case.  That said, even though these pieces of evidence may not seem particularly strong or credible, it is evidence from which a reasonable jury could conclude that the purported legitimate reasons for terminating Grope were pretextual. Thus, material factual issues in dispute as to whether the termination was pretextual preclude summary judgment for Ohio Bell on the FMLA claim.  *See Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) (reversing the district court's grant of summary judgment in favor of former employer as to plaintiff's FMLA retaliation claim).

## C.  Plaintiff's Disability Discrimination Claim

Plaintiff also raises a disability discrimination claim under Ohio Rev. Code Ch. 4112.  ECF No. 1-1 at ¶ 20-24.

Ohio Rev. Code 4112.02 states:

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the . . . disability . . . of any person, to discharge without just cause . . . or otherwise to discriminate against that person with respect to . . . terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

(4:11CV2293)

Ohio Rev. Code 4112.01(A)(13) defines the term "disability" as follows:

"Disability" means a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

Ohio case law under § 4112 employs the same analysis as federal case law on the Americans with Disabilities Act ("ADA").  *See* Kleiber v. Honda of America Mfg., Inc., 485 F.3d 862, 872 (6th Cir. 2007).  As such, § 4112 claims are often litigated under a *McDonnell Douglas* style framework.  *See* Hood v. Diamond Products, Inc., 74 Ohio St.3d 298, 302 (1996).

For a plaintiff "to establish a prima facie case of [disability] discrimination, the person seeking relief must demonstrate (1) that he or she was [disabled], (2) that an adverse employment action was taken by an employer, at least in part, because the individual was [disabled], and (3) that the person, though [disabled], can safely and substantially perform the essential functions of the job."  *Id.*  If the prima facie case is met, the burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the action taken.  *Id.* If the employer is able to offer such a reason, the employee must then demonstrate that the posited reason was a pretext for discrimination.  *Id.*

It is not in dispute that Grope suffered from a disability.  Also, Menough stated that Grope "seemed like he had every ability to be a successful technician."  ECF No. 53-3 at Page ID #: 922, Page 17.   As such, it is does not appear to be in dispute that Grope was able to perform the essential functions of the job.  Ohio Bell's argument against liability is two-

24

(4:11CV2293)

fold: (1) that there is no causal connection because Menough had no knowledge of Grope's disability and (2) that Grope was fired for legitimate reasons. ECF No. 53-1 at PageID #: 561-62.

As demonstrated above, there is a question of material fact as to whether Menough had knowledge of Grope's disability. If Menough did not have knowledge of the disability, then the prima facie case is not met. *See Nilles v. Givaudan Flavors Corp.*, 521 Fed. Appx. 364, 368 (6th Cir. 2013) (holding that "an employee cannot be considered to have been fired on the basis of disability unless the individual decision-maker who fired the individual had knowledge of that disability.") (internal quotations omitted); *see also Burns v. City of Columbus Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 844 (6th Cir. 1996) (holding that plaintiff could not establish his prima facie case because he failed to present any evidence to contradict the affidavit testimony of four of the seven Board members that they had no knowledge of plaintiff's disability when they made their decision to recommend his termination). Plaintiff has offered evidence that Menough did have knowledge of Grope's disability. *See* ECF No. 53-2 at PageID #: 667, Page 406. Because there is a dispute as to whether Menough had knowledge of Grope's disability, the matter is not appropriate for summary judgment.

Because Defendant has offered a legitimate reason for termination, ECF No. 53-7 at ¶ 5, the burden shifts to plaintiff to provide evidence of whether the proffered reason is pretextual. *Hood*, 74 Ohio St.3d at 302. As demonstrated in the FMLA retaliation claim

(4:11CV2293)

analysis above, the various statements Grope testified to, as well as the use of GPS records give rise to questions of material facts in dispute regarding pretext.

### IV.  Conclusion

For the reasons explained above, the Court denies Defendant's Motion for Summary Judgment (ECF No. 53) in its entirety.  The matter is set for trial on November 3, 2014 at 9:00 a.m.


IT IS SO ORDERED.


 July 28, 2014                                              /s/ Benita Y. Pearson                    
Date                                                     Benita Y. Pearson
                                                         United States District Judge